UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RANDI FERRARE,

    Plaintiff,

v.                                              Case No: 8:08-cv-1689-T-36MAP

MORTON PLANT MEASE HEALTH
CARE, INC.,

    Defendant.
_____/

# **O R D E R**

    This matter comes before the Court upon the Defendant's Motion for Summary Judgment (Doc. 40). In the motion, Defendant states that it is entitled to final summary judgment. Plaintiff responded in opposition to the Motion for Summary Judgment (Doc. 49), to which Defendant replied (Doc. 52). Upon due consideration of the parties' submissions, including deposition transcripts, affidavits, memoranda of counsel and accompanying exhibits, and for the reasons that follow, Defendant's Motion for Summary Judgment will be granted.

## I.    *Facts*[1]

    Defendant Morton Plant Mease Health Care ("MPM") is a community health alliance within the Baycare Health System that is anchored by four hospitals, including Morton Plant Hospital, Mease Countryside Hospital, Mease Dunedin Hospital, and Morton Plant North Bay Hospital. Doc. 51 at ¶ 1. During the period of 2006 through 2008, Dr. Donald Pocock served as the Chief Medical Officer for MPM and reported to Phil Beauchamp, the President of MPM. *Id.*

---

[1] As the parties in this case submitted a Joint Stipulation of Agreed Material Facts (Doc. 51), the Court cites this document where facts are undisputed, and otherwise determines facts in the light most favorable to the non-moving party based on the parties' submissions, affidavits, and deposition testimony.

at ¶¶ 2-3. In November 2006, Dr. Pocock hired Plaintiff Randi Ferrare as the Director of Health Management Services, to replace Jackie Munro. *Id.* at ¶ 4; Doc. 44 at 31:16-17. Ferrare reported directly to Dr. Pocock. Doc. 51 at ¶ 5.

In her role, Ferrare was charged with, among other things, supervising MPM's case management departments and an appeals and denials department. *Id.* at ¶ 6. Ferrare's key job duties included, among other things, ensuring that Medicare patients were properly statused in accordance with Medicare rules and guidance from government subcontractors and private contractors, identifying any significant changes to those rules or guidance that affected how patients should be statused, and notifying the senior management team of any changes. *Id.* at ¶ 7.

At varying times in her employment, two to three managers of the case management team reported directly to Ferrare. Doc. 44 at 27:7-8. At the time of her hire, those managers included Diana Cripe and Anita Russell. *Id.* at 28:23-29:3. Cripe and Russell supervised the clinical resource coordinators ("CRCs"). *Id.* at 29:15-20.

Ferrare describes Cripe and Russell as "very hard to work with." *Id.* at 43:22-44:1. Ferrare believes that her difficulty with these managers stemmed from the fact that they were friends with her predecessor, Munro, and that Cripe had applied for Ferrare's job but did not get it. *Id.* at 44:2-6. Ferrare was never able to improve her relationship with Cripe or Russell. *Id.* at 52:11-16. At some point in 2007 Anita Russell transferred to a different position within MPM and was replaced by Sharon Lang. *Id.* at 55:22-25.

As Director of Health Management Services, Ferrare made changes from the way things had been done under Munro and questioned the department's prior practices. *Id.* at 44:7-45:2. According to Ferrare, the department had documentation and communication issues, as well as a seven-page protocol that Ferrare did not understand. *Id.* at 49:1-13, 114:22-115:7.

In early 2007, the American Case Management Association ("ACMA") named the MPM case management team the best case management department in the country. *Id.* at 45:3-9, 82:19-22. MPM's submission for this award was based on the department's performance prior to Ferrare's employment. *Id.* at 45:10-16. Ferrare was given a copy of the submission at her orientation to help her learn about the program at MPM. *Id.* at 45:16-19. Ferrare states that this submission was her first "red flag" about MPM's admission protocol so she "knew [she] had to address that pretty much right away after [she] started." *Id.* at 46:5-8. Ferrare noted that MPM was "automatically making outpatient cardiac caths into inpatient without consideration of any clinical information." *Id.* at 46:18-20. Historically, this practice had been accepted by the government. *Id.* at 134:3-9. In 2007, Interqual, a third-party vendor that provides guidance to hospitals on how to comply with Medicare regulations, would change its guidance on the issue. *Id.* at 129:1-7, 134:10-16, 139:5-14; 169:11-15. However, Ferrare testified that Interqual "doesn't matter." *Id.* at 213:13-16.

In January of 2007, Ferrare complained to Dr. Pocock that patients coming in for cardiac catheterization procedures were being automatically statused as inpatients rather than outpatients. *Id.* at 110:9-111:25; 112:1-10; 119:2-9, 142:23-143:3. Ferrare believed this was contrary to Medicare regulations and that each status had to be changed by a physician – not a case manager. *Id.* at 113:17-19, 114:12-15. Hospitals get paid more for inpatients than outpatients because of room and board. *Id.* at 127:22-128:2. She brought her concern to Dr. Pocock, who directed her to Hal Ziecheck, Defendant's Chief Operating Officer, and Dr. Mark Michaelman. *Id.* at 116:18-22. Ziecheck told Ferrare to speak with Robert Lynch, the director of cardiology, and Dr. Michaelman referred her to Diane Kazmierski. *Id.* at 118:2-5, 132:24-133:6. Dr. Michaelman also told Ferrare that he had the process checked out by Medicare and they agreed with it. *Id.* at 269:3-16. Ferrare

was shown an email illustrating that the process had been vetted by senior management in 2006 and they supported it. *Id.* at 118:14-25. Ferrare was told about the process and agreed that all of the previous decisions were educated and went through the proper channels. Doc. 44-4 at p. 1; Doc. 44 at 204:13-25. Ferrare was "not really up on the procedures" and relied on a case manager named Celeste to help her "through what she was looking at and what she was told to do." *Id.* at 110:9-24, 142:9-10.

Ferrare was not the only person expressing concerns and confusion regarding the statusing of these patients. *Id.* at 147:22-25. In fact, Dr. Michaelman originally brought the issue to Dr. Pocock in early 2006. Doc. 47 at 34:13-23. Dr. Pocock shared the same concern and, in April of 2006, changed the policy. *Id.* at 30:15-32:5. However, while Dr. Pocock was on vacation in August of 2006, the board overturned his changes and went back to automatically statusing cardiac catheterization patients. *Id.* at 31:10-15. Dr. Pocock discussed his concerns with Ziecheck, in 2006. *Id.* at 31:1-9.

While attending the ACMA conference in the spring of 2007 to accept her department's award, Ferrare jumped a fence to swim in the resort pool after hours. Doc. 44 at 83:13-15. Ferrare also took a bottle of liquor from a hotel mini-bar, drank it, filled the bottle with water, and put it back in the mini-bar. *Id.* at 83:23-84:16.

In April of 2007 Ferrare received a positive performance evaluation from Dr. Pocock. Doc. 47-1 at p. 1-2.

On November 1, 2007, Ferrare and Lang held a meeting with the CRCs. Doc. 44 at 58:9-59:23. At this meeting, Ferrare and Lang spoke to the CRCs about the fact that they had been complaining about Lang to Anita Russell and Dr. Pocock. *Id.* at 59:6-19. Ferrare was upset that the CRCs went above her head, rather than complaining directly to her about Lang. *Id.* at 59:16-

23. Ferrare told the team that she was "pissed off that we've gotten to this point." *Id.* at 72:3-12. Ferrare states that Lang got very upset and the meeting got out of hand. *Id.* at 60:11-17. At one point, Lang pointed her finger at Doreen Farma, a CRC, and said "you're one of the ones who's a problem." *Id.* at 62:5-8. Ferrare thought Lang's actions were inappropriate but did not do anything in response to that incident. *Id.* at 62:9-14. However, Ferrare believes that Lang had the right to be angry with her staff because they were mean to her. *Id.* at 60:23-61:1. Ferrare felt that she and Lang had to "put [their] foot down and tell [the staff] we need to work things out between us and try to formulate some kind of a dialogue . . . ." *Id.* at 63:1-4. Ferrare wanted the staff to speak directly to her rather than go above her head. *Id.* at 63:6-21. Ferrare told her team she was embarrassed by their behavior. *Id.* at 71:5-13.

Following that meeting in November 2007, Doreen Farma and Dorothy McQueen complained to MPM's Team Resources department about Ferrare. Doc. 41 at 15:19-16:8. In those complaints, Farma and McQueen complained that Ferrare and Lang were creating a hostile work environment. Doc. 41-1 at p. 3-5. Upon receiving those complaints, Alex Baron, the Manager of Team Resources, interviewed five or six team members at the Dunedin hospital. Doc. 41 at 3:20-23, 16:9-17. Those team members complained that Ferrare and Lang were emotionally abusive, hostile, profane, and demeaning. Doc. 41-1 at p. 3-5. After completing his interviews, Baron prepared a summary of the feedback he received so Ferrare could not identify which person made which statement. Doc. 41 at 14:25- 15:2, 17:14-16.

Collotta and Baron then met with Ferrare and told her that they had received complaints from the staff that Ferrare and Lang were inappropriate toward them at a meeting. Doc. 44 at 55:13-21. Ferrare was given a list of statements, several pages long, that were reportedly made at the November 1st meeting. *Id.* at 56:5-25; Doc. 41-1 at p. 3-5. Ferrare told Baron and Collotta that

5

some of the things on the list were true but "a lot of it" was not true. Doc. 44 at 57:3-6. At the meeting, Ferrare agreed to coach Lang[2] on her communication style. *Id.* at 67:14-68:9. As a result of this meeting with Baron and Collotta, Ferrare understood that it was important to maintain a positive communication tone with her teams. *Id.* at 68:11-17.

On December 20, 2007, Dr. Pocock received an email from Collotta regarding the meeting she and Baron had with Ferrare on December 7, 2007. Doc. 47 at 54:18-55:7. Dr. Pocock understood this meeting to be the end result of an HR investigation which began with a complaint from Doreen Farmer on November 4, 2007. *Id.* at 56:1-10. Collotta wrote that "Randi did not deny or defend her behavior but stated that a shake-up was needed." *Id.* at 55:8-9; Doc. 41-1 at p. 2. The email contained a list of complaints made by MPM employees regarding Ferrare. Doc. 47 at 55:17-24; Doc. 41-1 at p. 3-5. However, the email also indicated that Baron had been told that management communication tone was greatly improved and the work environment had improved. Doc. 47 at 56:20-24; Doc. 41-1 at p. 2. Dr. Pocock has no record of meeting with Ferrare to discuss these issues specifically at any time before her termination. Doc. 57 at 59:13-20.

In early 2008 Ferrare was notified that she won the professional of the year award from the Association of Clinical Documentation Improvement Specialists ("ACDIS"). Doc. 47 at 52:14-22. She was nominated by some of her staff for this award. *Id.* at 53:2-7.

On or about January 23, 2008 Ferrare met with Ziecheck again to discuss whether the case management protocol was compliant with Interqual guidelines. Doc. 44 at 166:5-19. Ziecheck told Ferrare to put together a report for Dr. Pocock and himself to review. *Id.* at 166:14-19. Ferrare and another employee, Jeanne Huffman, worked together to create the report. *Id.* at 168:18-21.

---

[2] Lang left MPM shortly after this meeting occurred. Doc. 44 at 63:17-24.

In February of 2008, Ferrare brought up the issue of incorrect admission statuses to Jeff Durham, the Director of Audit Services & Corporate Responsibility for MPM. Doc. 44-4 at p. 3. Durham set up a meeting to discuss Ferrare's concerns with himself, Dr. Pocock and Jim Pfeiffer, MPM's Compliance Officer. *Id.* at p. 1-2. Ferrare thanked Durham for his support in this regard. *Id.* at p. 1-2. On March 3, 2008 the staff was told that, going forward, all cardiac catheterization procedures should be statused according to medical necessity using Interqual guidelines. Doc. 44-5 at p. 1-2; Doc. 44 at 216:10-217:2. Thus, by March 3, 2008, the process of statusing cardiac catheterization patients had been changed to the way Ferrare thought it should be done. *Id.* at 220:7-10. Ferrare did not think about whether any money needed to be repaid to the government based on the way statusing had been done in the past. *Id.* at 220:11-14.

In March of 2008 Dr. Pocock completed Ferrare's second performance evaluation, ranking her 4.77 out of 5 points overall. Doc. 47-1 at p. 5. Ferrare's lowest rating was on building trusting relationships with individuals. Doc. 47 at 88:22-89:1.

In the Spring of 2008, Ferrare attended another ACMA event, this time in Las Vegas. Doc. 44 at 89:1-5. At this event, Ferrare and her colleague Kathy Lux made a presentation about MPM's case management internship program. *Id.* at 89:6-21. Dr. Pocock received complaints that Ferrare was drinking too much at this event and failed to attend some of the meetings she signed up for. Doc. 47 at 68:19-69:6. After this event, at least ten people came to Dr. Pocock to complain about Ferrare. *Id.* at 65:13-71:2.

In May of 2008, Ziecheck pulled Ferrare into his office and asked her if she thought they were committing fraud. Doc. 44 at 104:7-105:5. Ferrare said "If you're intentionally doing what you're doing, then it is fraud." *Id.* at 106:16-18. Ferrare was referring to statusing all cardiac catheterization patients as inpatients. *Id.* at 106:19-22. Ferrare believed that MPM was restatusing

7

outpatient procedures to bill as inpatient to further its revenue. *Id.* at 107:2-6. Ferrare was aware that this policy was "supposed to change in March" but she does not know whether it actually changed. *Id.* at 108:13-23. Ferrare said she still did not "feel comfortable with the way things were being handled." *Id.* at 109:8-9.

In late May of 2008, after winning the ACDIS award for Professional of the Year, Ferrare contacted a recruiter and began looking for a different job. *Id.* at 241:16-24, 265:7-14. She planned to go to Phoenix with her secretary at the end of June 2008 to look into opening her own consulting business, called Optima. *Id.* at 243:23-245:14. Ferrare believed she was going to be fired, but planned to quit her job with MPM anyway. *Id.* at 245:5-10.

In June of 2008, Cripe and Huffman went to Dr. Pocock to complain about Ferrare. *Id.* at 99:20-100:1. They told Dr. Pocock that, unless something was done about Ferrare, they were going to leave MPM. Doc. 47 at 14:1-15. Dr. Pocock terminated Ferrare's employment on June 10, 2008. Doc. 51 at ¶ 8. Ferrare met with Dr. Pocock and Alex Baron in Dr. Pocock's office and was informed of her termination. Doc. 44 at 100:14-101:5. Ferrare was not given an explanation for her termination. *Id.* at 101:6-102:8. However, Ferrare knew she was at risk of being fired for the last year, even though nobody had told her that her job was in jeopardy. *Id.* at 103:10-15; 206:1-9. In Ferrare's mind she "was fired for uncovering the fraudulent activity that they were doing and making them change their policy, which cost them millions of dollars." *Id.* at 104:1-4. Ferrare states that for the last six months of her employment Ziecheck, Pocock and Cripe did not speak to her. *Id.* at 206:2-16. Almost immediately after her termination, Ferrare opened her own company, Optima. *Id.* at 246:21-23.

Ferrare did not contact the Department of Justice about MPM until after her employment was terminated. *Id.* at 236:9-14. Ferrare did not tell anyone at MPM, prior to her termination, that she was going to contact the government. *Id.* at 236:18-237:1.

## II.     *Standard of Review*

Summary judgment is appropriate only when the court is satisfied that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law" after reviewing the "pleadings, the discovery and disclosure materials on file, and any affidavits[.]" Fed. R. Civ. P. 56(c)(2).  Issues of facts are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A fact is "material" if it may affect the outcome of the suit under governing law. *Id*.  The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004).  That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003).

## III.    *Discussion*

Plaintiff alleges that MPM violated the anti-retaliation provision of the FCA, 31 U.S.C. § 3730(h), by terminating her employment in retaliation for her expressed concerns regarding possible overbilling. The anti-retaliation provision of the FCA in effect at the time of Plaintiff's termination provided:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h) (2008), *amended by* FERA, Pub. L. No. 111-21, § 4(d), 123 Stat. 1617, 1624–25 (2009).[3] The Eleventh Circuit has explained that a plaintiff seeking relief under this provision must show that: (1) the employee was engaged in protected conduct; and (2) the employer retaliated against the employee because of that protected conduct. *Mack v. Augusta-Richmond County, Georgia*, 148 F. App'x 894, 896–97 (11th Cir. 2005). In its Motion for Summary Judgment, MPM argues that, assuming Plaintiff can put forth a *prima facie* case of retaliation, she cannot establish that the reasons given by MPM for terminating her employment were pretextual. Plaintiff contends that pretext can be inferred through indirect evidence.

After a defendant provides a legitimate, nondiscriminatory reason for termination in response to the plaintiff's prima facie showing, the plaintiff bears the burden of persuasion that the proffered reasons are pre-textual. *Humphrey v. Sears, Roebuck, and Co.,* 192 F. Supp. 2d 1371, 1374 (S.D. Fla. 2002) (plaintiff's claim of retaliation did not withstand summary judgment where she did not introduce evidence to show the reason for her termination was not actually the violation of a particular policy); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). To establish pretext, a plaintiff must proffer evidence that would permit a reasonable fact finder to conclude that Plaintiff's alleged misconduct was not the real reason for the adverse employment action. *Torres v. Eagles Technologies, Inc.,* Case No. 8:09-cv-756-T-30EAJ, 2010 U.S. Dist. LEXIS

---

[3] The 2009 FERA amendments to the anti-retaliation provision only apply to conduct on or after May 20, 2009.  *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 n.5 (11th Cir. 2010).  Plaintiff was terminated on June 10, 2008.

55841, 17-20 (M.D. Fla. 2010) (plaintiff's failure to proffer circumstantial evidence of pretext sufficient to permit a reasonable fact finder to conclude that his positive drug test was not the reason for his termination was fatal to his claim of retaliation under Florida's Whistle-blower Act). A plaintiff may carry this burden by showing that the reason offered for termination had no basis in fact, the reason was not the true factor motivating the termination decision, or that the stated reason was insufficient to motivate the decision. *Holston v. The Sports Authority, Inc.,* 136 F. Supp.2d 1319, 1338 (N.D. Ga. 2000). Also, the law is clear that an employee's own evaluation and opinion is insufficient to establish pre-text. *Torres,* 2010 U.S. Dist. LEXIS 55841 at 18; *Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1332-33 (11th Cir. 1998).

Plaintiff first argues that pretext can be shown by the fact that the change in policy that she sought for over a year cost Defendant millions of dollars. However, Plaintiff has no evidence to indicate that this loss of revenue influenced Dr. Pocock's decision to terminate her employment. Furthermore, Dr. Pocock shared the same concern as Plaintiff did and attempted to change the same policy in April of 2006, prior to Plaintiff being hired, even knowing that there would be a cost to the Defendant. Doc. 47 at 30:15-32:5. Plaintiff testified that Dr. Pocock never did anything to try to stop her from raising her concerns about the statusing issues. Doc. 44 at 225:17-20. Plaintiff also testified that Dr. Pocock never made any comments to indicate he was unhappy with Ferrare for making complaints about statusing. *Id.* at 234:20-23. Dr. Pocock testified that Ferrare's approach to the automatic statusing issue had no impact on his decision to terminate her employment. Doc. 47 at 85:12-86:6.

Next, Plaintiff argues that Ziecheck wanted Plaintiff fired and used Dr. Pocock to get it done, *i.e.*, that Dr. Pocock was the cat's paw that carried out Ziecheck's retaliatory animus. Plaintiff testified that Ziecheck confronted her in May of 2008 to ask her if he thought MPM was

acting fraudulently. Plaintiff contends that this conversation is evidence of Ziecheck's desire to "get rid" of her and that Ziecheck used Cripe's complaint about Plaintiff as an excuse to get Dr. Pocock to fire Plaintiff. Again, Plaintiff cites no evidence to support this theory. There is no evidence that Ziecheck ever recommended to Dr. Pocock that he terminate Plaintiff's employment. Instead, the evidence shows that Ziecheck was aware that both Ferrare and Pocock opposed the automatic statusing policy, yet he never took any action against either of them. Dr. Pocock testified that he did not seek anyone's approval of his decision to terminate Plaintiff, and only discussed the matter with Baron and Collotta.

Finally, Plaintiff argues that Dr. Pocock's failure to investigate the complaints made by Cripe and Markowicz shows that his decision was motivated by retaliatory evidence. Yet, there is no evidence to support a deviation from normal procedures[4] and, even if there was, the "[f]ailure to follow internal procedures is generally not enough to create a genuine issue of fact as to discriminatory motives." *Grubb v. Southwest Airlines*, 296 F. App'x 383, 390 (5th Cir. 2008) (citing *Moore v. Eli Lilly & Co.,* 990 F.2d 812, 819 (5th Cir. 1993)).

Ferrare's testimony shows that it is only her "belief" that she was terminated because of her complaints. The evidence shows that Dr. Pocock was presented with an ultimatum – either fire Ferrare for her inappropriate conduct or lose Cripe and Hauffman. Ferrare admits to some unprofessional behavior and personality conflicts, especially with Cripe. Ferrare also admits that she expected she would be fired for the last year of her employment, intended to quit anyway, and had begun plans to open her own consulting company. While Dr. Pocock may not have had the full story before making a decision, it is not the job of this Court, or a jury, to quarrel with the

---

[4] MPM's progressive discipline policy did not apply to managers or directors, including Ferrare's position. Doc. 41 at 23:13-24:11.

wisdom of his choice. Courts "do not sit as a 'super-personnel department' weighing the wisdom of a promotion decision, but are concerned only with whether the employer's explanation for its action was honest." *O'Regan v. Arbitration Forums, Inc.,* 246 F.3d 975, 984 (7th Cir. 2001) (citations omitted). There is no evidence to suggest that Dr. Pocock terminated Ferrare for any other reason than Cripe's complaint and threat to leave.

Plaintiff has failed to rebut Dr. Pocock's legitimate, non-retaliatory reason for her termination. Because she has failed to create a genuine issue of material fact as to the issue of pretext, Defendant is entitled to judgment in its favor as a matter of law. Accordingly, it is hereby

**ORDERED**:

1. Defendant's Motion for Summary Judgment (Doc. 40) is GRANTED.

2. The Clerk is directed to terminate all pending motions, enter judgment in favor of Defendant and close the file.

**DONE AND ORDERED** in Tampa, Florida on October 20, 2014.

*[signature]*
Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any